**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| NEC Corporation, | |
| *Plaintiff*, | |
| v. | **TRIAL BY JURY DEMANDED** |
| Becker Professional Development Corporation | |
| *Defendant*. | |

## COMPLAINT FOR PATENT INFRINGEMENT

1.     Plaintiff, NEC Corporation ("Plaintiff" or "NEC") files this Complaint for patent infringement and demand for jury trial against Defendant Becker Professional Development Corporation d/b/a Becker Professional Education ("Defendant" or "Becker"), and alleges as follows:

## NATURE OF THE ACTION

2.     This is an action for patent infringement under the Patent Laws of the United States, Title 35 United States Code ("U.S.C.") against Becker for infringement of U.S. Patent No. 8,752,101 (the "'101 Patent") (the "patent-in-suit"), which is attached as Exhibit A, and incorporated herein by reference, pursuant to 35 U.S.C. § 271, to recover damages, attorney's fees, and costs.

## THE PARTIES

3.     Plaintiff NEC is a corporation organized under the laws of Japan, with its principal place of business at 7-1, Shiba 5-chome Minato-ku, Tokyo 108-8001 Japan.

4.     Upon information and belief, Defendant Becker Professional Development Corporation is a corporation organized under the laws of the State of Delaware, with its principal places of business at least at 10260 N Central Expressway, Dallas, TX 75231 and 399 S Spring

Ave Ste 108, Saint Louis, MO 63110-1216.  Becker conducts business, either directly or through

its agents, on an ongoing basis in this judicial district and elsewhere in the United States and has

a regular and established place of business in this judicial district, as discussed below.

## JURISDICTION AND VENUE

5.     This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et

seq*.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1338(a).

6.     Defendant is subject to this Court's specific and general personal jurisdiction,

pursuant to constitutional due process and the Texas Long-Arm Statute, due at least to its extensive

business in the jurisdiction of the United States District Court, Northern District of Texas (this

"District"), including its infringement alleged herein.  This Court has specific and general personal

jurisdiction over Defendant at least because it (1) committed acts of patent infringement and

contributed to and induced acts of patent infringement by others in this District; (2) regularly did

business or solicited business in this District; (3) engaged in other persistent courses of conduct

and derived substantial revenue by its offering of infringing products and services and providing

infringing products and services in this District; and (4) purposefully established substantial,

systematic, and continuous contacts with this District and should have reasonably expected to be

subject to suit here by its maintenance of a regular and established physical place of business in

this District and offering of infringing products and services and providing infringing products and

services in this District.

7.     Defendant, directly, has purposefully and voluntarily placed infringing products

into this District and into the stream of commerce with the intention and expectation that the

infringing products will be purchased for use in this District.

8.      Venue is proper in this judicial district under at least 28 U.S.C. §§ 1391(b), (c) and/or 28 U.S.C. § 1400(b).  Venue in this District is proper for Becker at least because Becker has committed acts of infringement in this District as detailed throughout this complaint, and Becker has a regular and established place of business in this District.  For example, Becker has a regular and established place of business through its physical location in Dallas, Texas listed below.

9.      Becker provides streaming multimedia content services to customers throughout the United States, which is accessible in and used by consumers in Texas and in this District through its website at https://www.becker.com/ in an infringing manner, as detailed throughout this complaint.  On information and belief, infringing activities, such as streaming, occur in this District as a result thereof.

10.     In addition to its online website at https://www.becker.com/, Becker maintains a physical location at 10260 N Central Expressway, Dallas, TX 75231.  At this physical location Becker offers live on-site courses in Dallas, Texas.  On information and belief, infringing activities, such as streaming, occur at Becker's Dallas facility.



## **FACTUAL ALLEGATIONS**

11.    Founded in 1899 and based in Tokyo, Japan, NEC (Nippon Electric Company) has throughout its 120-year history been a world leader and innovator across a variety of technical industries, including in electronic devices, computing, computer displays, semiconductors, mobile phones and communications, and most recently, software and artificial intelligence solutions. Over the years, NEC has expended significant resources on research, development, and innovation, and on capturing and protecting the fruits of those efforts in patent applications filed around the world.  The patent-in-suit, which provides an improved multimedia content delivery system and method, was born from this history of innovation.

12.    NEC is the owner of the patent-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

13.    The claims of the patent-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101.  They are not directed to any abstract idea, and the technologies covered by the

claims comprise content delivery and distribution systems and/or consist of ordered combinations of features and functions that, at the time of the invention, were not, alone or in combination, well-understood, routine, or conventional.

14.    On information and belief, Defendant offers and has offered content streaming services (the "Accused Products")—such as through the "Becker Web Application," Becker's mobile iOS and Android apps, and including, for example, using at least in part software systems and services obtained from or provided by Panopto, Inc.—that deliver content data from a transmission device to one or more reproduction devices.  For example, the Accused Products embody a content distribution method applied to a distribution system including a transmission device and a reception device.  For example, the accused products include all of Becker's content streaming products and services that used adaptive bit rate streaming and practiced the claims over the prior six years, including both current and prior technological systems.  This includes but is not limited to Becker's Certified Public Accountant (CPA), Certified Management Accountant (CMA), and Enrolled Agent (EA) exam review courses; Becker's Continuing Professional Education (CPE) course/webinar offerings, and all prior products or offerings that Becker currently or has previously offered in the past six years regardless of whether certain technological components (or vendors thereof) were changed during the past six years.  As an example, Becker's previously offered streaming services include, but are not limited to, Becker's United States Medical Licensing Examination (USMLE), National Council Licensure Examination (NCLEX), Chartered Institute of Management Accountants (CIMA), Diploma of International Financial Reporting (DiplFR), and Project Management Professional (PMP) exam review courses to the extent they were offered within the past 6 years and used adaptive bit rate streaming functionality that practiced the claims of the '101 Patent.

15.     The patent-in-suit is described briefly as follows:

**The '101 Patent**

16.     On June 10, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '101 Patent, entitled "DISTRIBUTION SYSTEM" after a full and fair examination.  The claims of the '101 Patent were confirmed again in an *inter partes review* proceeding before the United States Patent and Trademark Office's Patent Trial and Appeal Board, filed July 27, 2023.  On March 3, 2025, the United States Patent and Trademark Office in that proceeding issued a Final Written Decision further confirming the validity of the claims of the '101 Patent, finding no claims of the '101 Patent had been shown to be unpatentable.  *See Peloton Interactive, Inc. v. NEC Corporation*, IPR2023-01239, Paper No. 43 (P.T.A.B. Mar. 3, 2025).  The '101 Patent is attached hereto as Exhibit A and incorporated herein as if fully rewritten.

17.     Claim 11 of the '101 Patent recites:

> "11.  A distribution method applied to a distribution system including a transmission device and a reception device configured to be capable of communicating with each other, the distribution method comprising:
> transmitting content data, which is one content coded with any one code rate of a plurality of code rates different from each other, to the reception device, by the transmission device;
> while receiving the content data transmitted by the transmission device, storing received data of the content data into a storage device and also reproducing the content based on the stored data, by the reception device;
> determining the code rate based on a remaining time before reproduction start time set as time at which the reception device starts reproduction of the content from a present moment, and based on an available reproduction time, which is a time available for reproducing the content based on the content data stored in the storage device of the reception device;
> changing the code rate of the content data to be transmitted to the reception device to the determined code rate, by the transmission device; and
> starting reproduction of the content at the set reproduction start time, by the reception device."  *See* Exhibit A.

18.     At the time of the inventions, a number of technical problems existed in streaming networks.  For example, end users frequently did not have consistent bandwidth or quality of

service.  *Id.* at 20:48-50.  As a result, without adjustment to streaming methodology, users with lower quality of service or inconsistent bandwidth experienced undesirable buffering, unsteady or unstable playback resolutions, and/or excessively reduced quality to accommodate the weakest infrastructure.  *Id.* at 1:62-2:21. These problems are unique to the streaming and content delivery environment as the problems arise from technical constraints and the underlying operations associated with transmitting content over a network are not, for example, longstanding human activity or mental processes.  *Id.*

19.     By way of further example, user devices (or reproduction devices) with different design and different capabilities were being rapidly developed and updated.  *Id.* at 5:27-35.  As a result, users with different devices or versions of hardware or software had different streaming experiences, including experiencing better (or worse) network connectivity, and buffering while viewing streamed content.  *Id.* at 1:54-64.

20.     At the time of the inventions, other methods of addressing the technical problems existed, such as downloading the media completely before playback or reducing bit rate (and therefore quality) for the entire stream and/or all users, or failing to start reproduction of content at the appointed start time.  *Id.*  These other solutions had drawbacks, such as delaying the ability to view or otherwise consume content or reducing the quality to an unnecessary degree.  *Id.* at 20:48-50.

21.     The systems, devices, and methods of the '101 Patent improved upon other streaming methods at the time.  In particular, the '101 Patent itself identifies two previous methods that use alternative mechanisms, which had shortcomings because "the amount of data that the reception device receives from the transmission device per unit time (i.e., communication speed) varies depending on the status of use of a communication line, and so on."  *Id.* at 1:54-58.  The

inability to adequately adapt to communication speed changes due to varying networking conditions resulted in cases where the available reproduction time was not able to reach a sufficient level by the start time thus delaying the start time. *Id.* at 1:58-64.

22.     The inventions claimed in the '101 Patent are new, inventive solutions that allow each user to be able to have the best streaming experience regardless of different equipment, different service providers, different quality of service, and the like and without the drawbacks of the other methods available at the time of the invention for addressing the above-referenced problems. *Id.* at 2:4-17.

23.     The claimed solutions are rooted in technology.   The inventions embody operational characteristics of the streaming system, including the amount of content stored in the buffer or other storage of the user device (or reproduction device) as a function of time for playback (or reproduction) of that content, the amount of content remaining to be transmitted and stored on the device, and the start time of the playback of the content to determine and set the bit (or code) rate of the remaining data to be transferred to ensure that the playback of the content on the user device does not outpace the transmission capabilities and buffering or storage capabilities of the user device. *Id.* at 1:65-2:3, 25:60-26:16. The recited technical solutions thereby avoid problems like unsteady or unstable playback quality, pausing of playback to wait for more content, and delayed start of playback to wait for the entire content stream to be downloaded.

24.     The claimed solutions recite more than just adjusting the speed or size of data transmissions.  The claims recite specific processes to determine code rate as a function of the set playback start time and the amount of content buffered or stored on the user device and the time it will take to play that stored information and then changing the code rate to the determined rate to

ensure that playback does not exceed the system's ability to transmit the remaining content data stream and do not merely recite results.  *See id.,* at 24:38-29:24.

25.    The claimed solutions are not directed to longstanding human activity as the claims recite changing network operations by calculating code rate using specific technical parameters.  Furthermore, code rates are a distinctly technical concept as it is the density of bits relative to a period of time.  Indeed, the specification is clear on this point, stating, for example, that "[t]he code rate represents the data amount (the data size, e.g., the number of bytes) of content data for reproducing content at constant speed (reproducing content at 1× speed) for a unit time (e.g., one second)." *Id.* at 7:8-11.  To illustrate the impact of the code rate, the density of content data is proportional to the resolution of playback.  Thus, in addition to humans not changing network and device operation and performance during streaming of digital content over a network, humans also do not change the code rates of their own speech because to do so would require degrading or improving the quality of their speech, which is nonsensical.  The lack of connection to longstanding human activity is further illustrated by claims that recite the technical operation changes for multiple devices or users on the network, synchronizing playback among multiple users or devices, applying further specific rules to select code rates, and the like.

26.    For example, Claim 11 of the '101 Patent recites a non-abstract method for distributing content data including a transmission device and a reception device that solves the technical problems described within the patent, *see, e.g.*, Exhibit A at 1:42-2:17, among others. It does so by reciting the process of determining the bit rate for a particular user device using operational characteristics of the device—time remaining before the device begins reproducing received content and playback time for reproducing the stored (or buffered) content.  *See id.,* at 26:5-14.  The claim further recites using the determined rate to change the technical operation of

9

the network and performance of the reproduction device by adjusting the code rate of the content data to the determined rate so that the user receives all content, at an appropriate resolution and an appropriate time, without overloading the bandwidth of the user's device and causing unsteady or unstable playback resolutions, buffering, or other delays in delivery. *Id.* at 26:1-4. Thus, Claim 11 recites more than results of the method and more than simply sending and receiving data. It instead recites both how the code rate is determined through the recited specific rules and how the operation of the network and reproduction device is changed as a result of the recited method to improve the operation of the user device (e.g., less jitter, delay, pausing) and improve the user experience. Thus, at least Claim 11 is not directed to an abstract idea and is inventive.

27.    Claim 11 also recites the specific technical environment that makes express that the claimed invention solves a technical problem.  For example, Claim 11 recites "one content coded with any one code rate of a plurality of code rates different from each other," which indicates that the content data has multiple versions of the content data each having different code rates, which means that a version needs to be picked. *Id.* at 25:64-67.  If the wrong version is used due to insufficient determination of the best rate for the particular technical environment at the time or streaming, the penalty is poor performance at the client device. *Id.* at 1:54-64.

28.    The remaining limitations of Claim 11 provide a technical solution that answer how and why a particular version is selected and implemented.  Claim 11 recites "determining the code rate based on a remaining time before reproduction start time set as time at which the reception device starts reproduction of the content from a present moment, and based on an available reproduction time, which is a time available for reproducing the content based on the content data stored in the storage device of the reception device," to specify how the code rate can be determined, thereby enabling the content data to be transmitted and reproduced reliably even under

circumstances of varying network quality. Accordingly, the variable "remaining reproduction time" is determined at individual moments based on the amount of data in the buffer of the reception device. Similarly, the "remaining time before reproduction start time" also constantly updates as the start time approaches.

29. The '101 Patent specification confirms the technical solution to the technical problem. For example, the specification explains that as a result of practicing the claimed invention, "it is possible to cause the reception device to securely start reproduction of the content at the set reproduction start time while avoiding meaninglessly lowering the code rate." *Id.* at 19:53-55. The specification further explains that "an object of the present invention is to provide a distribution system capable of solving the above-mentioned problems, 'the code rate may be [set to] be extremely high' and 'the reception device [may be] unable to start reproduc[ing] content a[t a] set reproduction start time.'" *Id.* at 2:21-25.

30. As a result of the recited altered technical operation of the streaming system using the recited method, a user device is able to play (or reproduce) the content with increased stability in the playback resolution and little to no pausing. *Id.* at 2:21-25. Thus, the solution to the technical problems is found in the language of at least Claim 11.

31. The inventiveness of these technical solutions recited by the claims of the '101 Patent is evidenced by what a provider of an example of underlying accused functionality has said about the accused functionality. Even years after the invention date, JW Player CEO, Dave Otten, highlighted the significance of the infringing, claimed process that prioritizes video start time: "Video start speed is of the utmost importance to our customers, especially when their users are watching video on mobile devices. Every second of delayed start or buffering can cost them millions of dollars of lost revenue." Exhibit D at 2. The same article also notes the importance of

maintaining the highest resolution (which is proportional to bit rate), further evidencing that the claimed adaptive bit rate process that balances reducing delayed video start time and quality is inventive. *Id.* at 1.

32.     The specific elements of Claim 11 of the '101 Patent were an unconventional arrangement of elements compared to prior art content delivery systems and were not well-understood or routine. As also discussed above in Paragraphs 19-20, at the time of the invention, other methods attempted to solve the problem differently. For example, Claim 11 of the '101 Patent was able to unconventionally change the code rate of the content data to be transmitted to the reception device as opposed to, for example, preventing playback until all content data is received or causing a pause in playback while additional data is received and prepared for playback. Claim 11 is similarly inventive over prior methods that reduced the quality of the entire content stream.

33.     At least the "determining the code rate based on a remaining time before reproduction start time set as time at which the reception device starts reproduction of the content from a present moment, and based on an available reproduction time" and "changing the code rate of the content data to be transmitted to the reception device to the determined code rate, by the transmission device" limitations are unconventional and inventive because adjusting the code rate based on a remaining time before reproduction start time and an available reproduction time were not well understood or routine at the time of the invention.

34.     The ordered combination of the limitations of Claim 11 are unconventional and inventive because first determining an available reproduction time and then next determining an available time before reproduction start time to calculate an optimal code rate and then using the calculated code rate to change the operation of the transmission device and thereby ensuring that

a buffer of the reception device is filled as efficiently as possible with the best possible code rates (and thereby resolutions) was not well understood or routine at the time of the invention. The specification also confirms that the limitations and ordered combinations are inventive over prior methods. Exhibit A at 2:21-21-25, 19:53-55, and 20:48-50. Thus, at least Claim 11 is inventive and patent eligible under Section 101.

35. By way of further example of the subject matter eligibility of the '101 Patent claims, claims 12, 14, and 15 are also non-abstract and recite inventive concepts.

36. Dependent Claim 12 recites a technical solution to a technical problem that is not abstract. For example, Claim 12 recites that the code rate will become smaller (e.g., resulting in a shorter time to transmit or download) as "the available reproduction time becomes shorter than a target available reproduction time" and "becoming smaller as the remaining time becomes shorter." The ongoing adjustment to code rate solves the problem of avoiding buffering or skipping segments as the technical conditions change over the course of the steaming session—problems which are compounded when, for example, the streaming session is for a live stream or for a group.

37. Further, dependent Claim 12 recites an additional inventive solution to a technical problem. The requirement of use of a target reproduction time in addition to Claim 11's inventive process to factor to determine the bit rate was also not routine or well understood in the field at the time of the invention. Thus, at least Claim 12 is not directed to an abstract idea and is inventive.

38. Claim 14 recites a technical solution to a technical problem that is not abstract. Claim 14 solves the additional technical problem of changing network and client devices during a stream by "determining the code rate with every change period set in advance." Because network conditions are continuously changing, adjusting the code rate at preset intervals ensures that the

poor performance due to deterioration of the network and device conditions over the course of a stream is avoided and that the code rate is not set unnecessarily low if conditions improve such that the stream quality is unnecessarily low.

39.     Further, dependent Claim 14 also recites an additional inventive solution to a technical problem.  Claim 14 recites the additional step of "determining the code rate with every change period set in advance," which was not routine or well understood in the field at the time of the invention. Adding adjustment to code rates over the course of a streaming session adds to processing and network overhead.  At the time of the invention and given the state of networks and devices at that time, it would have been unconventional to add complications and overhead to a streaming system.  Thus, at least Claim 14 is not directed to an abstract idea and is inventive.

40.     Claim 15 recites a technical solution to a technical problem that is not abstract. Claim 15 adds to the method of Claim 11: "including a plurality of the reception devices" by "matching reproduction positions of the content to be reproduced by the plurality of the reception devices, respectively, with each other among the plurality of the reception devices."  The claim therefore ties the claim to an environment where a provider wants to synchronously stream to a plurality of users.  By adding the matching of the operational characteristics of "reproduction positions" for multiple client devices, the technical problems solved by Claim 11 are solved for multiple devices and the problem of synchronizing streams for multiple users—each potentially with different network capabilities, device capabilities, and code rates—are solved.

41.     Further, dependent Claim 15 also recites an additional inventive solution to a technical problem.  Claim 15 recites the additional step of "matching reproduction positions of the content to be reproduced by the plurality of the reception devices, respectively, with each other among the plurality of the reception devices," which was not routine or well understood in the

field at the time of the invention. Claim 15 adds a requirement that the reproduction position—a technical characteristic of the client devices—be matched to provide synchronization on top of varying code rates set as a result of the inventive process of Claim 11. The addition of steps to synchronize multiple devices operating under different conditions with different capabilities and with determined bit rates add processing and networking overhead to the stream. At the time of the invention and given the state of networks and devices at that time, it would have been unconventional to add complications and overhead to a streaming system. Thus, at least Claim 15 is not directed to an abstract idea and is inventive.

### Infringement of the '101 Patent

42.     Plaintiff realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

43.     On information and belief, Defendant directly infringes, literally and/or under the doctrine of equivalents, at least Claims 1, 2, 4, 5, 11, 12, 14–16, 18, 20–23, 25, and 26 of the '101 Patent in violation of 35 U.S.C. § 271(a).

44.     On information and belief, Defendant makes, has made, offers to sell, sells and/or uses the Accused Products.

45.     On information and belief, the Accused Products embody the content distribution methods, devices, and systems claimed in the '101 Patent. The Accused Products include servers configured to communicate with a reception device as described in and claimed by the '101 Patent. *See* Exhibits B and C. Thus, Defendant's Accused Products infringe the '101 Patent.

46.     For example, use of the Accused Products includes running Becker's Web Application, iOS app, or Android app (and, including a client that utilized a solution provided in part by Panopto, Inc.). A Becker controlled server sends content data to the Becker Web Application, iOS app, Android app, and the Panopto client, and the code rate is changed during

the transmission described in and claimed by the '101 Patent. Thus, on information and belief, Defendant directly infringes the claimed patent for content distribution as described in the '101 Patent by making, having made, offering to sell, selling and/or using the Accused Products including the claimed communication between a server and reception device. In particular, Defendant infringes the '101 Patent at least when it sells subscriptions to use the Accused Products, and/or when its employees conduct testing on the Accused Products. Defendant further infringes the '101 Patent by training its customers on the use of the Accused Products and/or promotion and/or sales of the Accused Products to Becker's customers. Non-limiting exemplary claim charts comparing Accused Products to the '101 Patent are attached hereto as Exhibits B and C.

47.     On information and belief, Defendant is liable for joint/divided infringement of, or is vicariously liable for infringement of, the '101 Patent by directing and controlling its customers' infringing conduct. For example, on information and belief, Defendant is liable for joint/divided infringement of, or is vicariously liable for infringement of, the '101 Patent at least when Defendant's customers use(d) the Accused Products such as the Becker Web Application, Becker iOS app, Becker Android app, including, for example, using at least in part software systems and services obtained from or provided by Panopto, Inc., to stream media in an infringing manner as set forth in Exhibits B and C.

48.     On information and belief, Defendant maintains control over the use of the Accused Products. For example, Defendant maintains and controls access to content streamed to end user devices.

49.     As another example, on information and belief, Defendant is liable for joint/divided infringement of, or is vicariously liable for infringement of, the '101 Patent by directing and controlling one or more third party's infringing conduct. For example, the method of Claim 11 of

16

the '101 Patent includes a transmission device. *See* Exhibits B and C. On information and belief, Defendant is liable for joint/divided infringement of, or is vicariously liable for infringement of, the '101 Patent at least when Defendant uploads content to and configures one or more third party servers to transmit contents to users in an infringing manner.

50.     Defendant knew of the '101 Patent and its infringement thereof before the filing of this Complaint . For example, NEC put Defendant on notice of its infringement of the '101 Patent at least in a letter dated October 10, 2023.

51.     On information and belief, Defendant indirectly infringes, literally and/or under the doctrine of equivalents, at least Claims 1, 2, 4, 5, 11, 12, 14–16, 18, 20–23, 25, and 26 of the '101 Patent.

52.     On information and belief, Defendant is liable for inducing infringement of the '101 Patent under 35 U.S.C. § 271(b) by having knowledge of the '101 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '101 Patent, with specific intent, by its customers.

53.     Specifically, Defendant induces infringement of the '101 Patent by training, promotion, and/or sales of the Accused Products to Becker customers for their use of the content distribution methods, devices, and systems claimed in the '101 Patent. On information and belief, Becker provides demonstrations and user manuals to Becker customers that teach or otherwise instruct users to use the Accused Products in an infringing manner. Defendant's customers for the Accused Products directly infringe the '101 Patent by using the Accused Products as instructed by Defendant.

54.     As alleged above, Defendant had knowledge of the '101 Patent before the filing of this Complaint and knew, should have known, or was willfully blind to the fact of Defendant's

infringement of the '101 Patent before the filing of this Complaint.  For example, NEC put Defendant on notice at least in a letter dated October 10, 2023.  Further, NEC has asserted the '101 Patent against others.  Defendant knew or should have known of a high risk of infringing the '101 Patent at least in light of NEC's letter and NEC's prior suits.  Despite knowing that its actions constitute induced infringement of the '101 Patent and/or despite knowing that there was a high likelihood that its actions constitute induced infringement of the patent, Becker nevertheless continues its infringing actions, and continues to make, use, sell, and/or offer for sale one or more of the Accused Products.

55.     Becker is liable for contributory infringement of the '101 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Products within the United States because the Accused Products constitute a material part of the invention embodied in the '101 Patent, which Becker knows to be especially made and/or especially adapted for use in infringement of the '101 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

56.     Specifically, Becker contributes to infringement of the '101 Patent by, inter alia, promotion, and/or sales of the infringing Accused Products to Becker's customers for their use of the content distribution method as claimed in the '101 Patent.  Those customers directly infringe the '101 Patent by using the Accused Products.

57.     By engaging in the conduct described herein, Defendant has injured NEC and is thus liable for infringement of the '101 Patent, pursuant to 35 U.S.C. § 271.

58.     Defendant has committed these acts of infringement without license or authorization.

59.    As a result of Defendant's infringement of the '101 Patent, Plaintiff has been, and will continue to be, damaged and will suffer irreparable injury unless the infringement is enjoined by this Court pursuant to 35 U.S.C. § 283 and/or the equitable powers of this Court.

60.    As a result of Defendant's infringement of the '101 Patent, Plaintiff has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendant's past infringement, together with interests and costs.

61.    As alleged above, Defendant had knowledge of the '101 Patent before the filing of this Complaint and knew, should have known, or was willfully blind to the fact of Defendant's infringement of the '101 Patent before the filing of this Complaint.  Despite such knowledge, Defendant has continued its infringing activities.  Upon information and belief, Defendant's infringement of the '101 Patent is willful, entitling Plaintiff to enhanced damages pursuant to 35 U.S.C. § 284.  This action also is exceptional within the meaning of 35 U.S.C. § 285, entitling Plaintiff to its attorneys' fees and expenses.

62.    NEC is in compliance with 35 U.S.C. § 287.

## DEMAND FOR JURY TRIAL

63.    Plaintiff demands a trial by jury of any and all causes of action.

## PRAYER FOR RELIEF

64.    WHEREFORE, Plaintiff prays for the following relief:

a.    That Defendant be adjudged to have directly infringed the patent-in-suit either literally or under the doctrine of equivalents, and to have indirectly infringed the patent-in-suit by inducement and contributory infringement;

b.    An award of damages to Plaintiff and against Defendant pursuant to 35 U.S.C. § 284 adequate to compensate Plaintiff for the Defendant's past infringement and any continuing or future infringement, including compensatory damages, lost profits, and/or a reasonable royalty;

c.  A declaration that Defendant's infringement is willful and an award of enhanced damages, in the form of treble damages, pursuant to 35 U.S.C. § 284;

d.  An accounting of all infringing sales and damages including, but not limited to, those sales and damages not presented at trial;

e.  An assessment of pre-judgment and post-judgment interest and costs against Defendant, together with an award of such interest and costs, in accordance with 35 U.S.C. § 284;

f.  That Defendant be directed to pay Plaintiff's attorneys' fees incurred in connection with this lawsuit pursuant to 35 U.S.C. § 285; and

g.  That Plaintiff be granted such other and further relief as this Court may deem just and proper.

Dated: March 28, 2025                    Respectfully submitted,

_/s/ Harrison Rich_

Harrison G. Rich
Texas Bar No. 24083730
Megan LaDriere White
Texas Bar No. 24083348
Griffin R. Tolle
Texas Bar No. 24115349
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, TX 75201
Telephone: (214) 953-6896
Fax: (214) 953-6503
Harrison.Rich@bakerbotts.com
Megan.White@bakerbotts.com
Griffin.Tolle@bakerbotts.com

Lance Goodman
Texas Bar No. 24132186
**BAKER BOTTS L.L.P.**
401 S 1st Street, Suite 1300
Austin, TX 78704
Telephone: (512) 322-2500
Fax: (512) 322-2501
Lance.Goodman@bakerbotts.com

Robert L. Maier (_pro hac vice_ forthcoming)
Jennifer C. Tempesta (_pro hac vice_ forthcoming)
Michael E. Knierim (_pro hac vice_ forthcoming)
Matthew Thompson (_pro hac vice_ forthcoming)
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, NY 77912
Telephone: (212) 408-2500
Fax: (212) 408-2501
Robert.Maier@bakerbotts.com
Jennifer.Tempesta@bakerbotts.com
Michael.Knierim@bakerbotts.com
Matthew.Thompson@bakerbotts.com

**_Counsel for Plaintiff NEC Corporation_**